AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
JUL 17 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>One (1) Apple iPhone A1661<br>FCC# BCG-E3087A<br>IC# 579C-E087A | Case No. **18MJ4049** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Please see Attachment A-1.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:
Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841, and 846 | Possession with Intent to Distribute Cocaine, and Conspiracy |
| 21 U.S.C. 952, 960, 963 | Importation of Cocaine, and Conspiracy |

The application is based on these facts:
Please see Affidavit of Special Agent Joseph Rawley

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Rainer Mendoza, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7-17-18

_____
*Judge's signature*

City and state: San Diego, CA

The Honorable Nita L. Stormes, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Rainier Mendoza, Special Agent ("SA"), Homeland Security Investigations ("HSI"), after being duly sworn, state:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for an Apple iPhone A1661 FCC# BCG-E3087A, IC# 579C-E087A (the "**Target Phone**"), further described in Attachment A (incorporated herein by reference), which was seized from Kimberly REYES on or about February 13, 2018 pursuant to her arrest for importing cocaine, and is currently in the possession of the Office of the Special Agent in Charge ("SAC"), Homeland Security Investigations ("HSI"), at 880 Front St, San Diego, California 92101.

2. I seek authority to search the **Target Phone** for evidence of illegal activity, described more fully in Attachment B (incorporated herein by reference), from October 7, 2017 through February 13, 2018, of violations of 21 U.S.C. §§ 841, 846, 952, 960, and 963

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth every fact that others or I have learned during the course of this investigation. Dates, times and amounts are approximate.

## EXPERIENCE AND TRAINING

4. I am a Special Agent employed by the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed as an HSI SA since December of 2016. Currently, I am assigned to the Contraband Smuggling Group IV in San Diego, California. Prior to becoming an HSI SA, I was a Border Patrol Agent in the United States Border Patrol since July of 2008. I am a graduate of the Federal Law Enforcement Training Center ("FLETC").

5. I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of

1

the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As such, I am empowered to conduct investigations of and to make arrests for federal offenses. I have been cross-designated by the Drug Enforcement Administration ("DEA") to conduct investigations and make arrests based on violations of Title 21 of the United States Code.

6. As an HSI SA, my primary duties include the investigation of narcotics-related violations of Title 21 of the United States Code. I investigate violations of the United States Code that stem from the International border between Mexico and the United States, including drug trafficking. I have participated in investigating various drug trafficking organizations that are involved in the acquisition, importation, transportation, and distribution of controlled substances into and through the Southern District of California. I have spoken with other agents with extensive experience in narcotics trafficking investigations.

7. I have arrested or participated in the arrest of numerous persons for violations of the Controlled Substances Act. In these cases, I have conducted well over 100 interviews with the arrested persons and their associates, as well as cooperating individuals and informants. I have conducted surveillance of narcotics traffickers as they conduct their trafficking activity while crossing the border from Mexico into the United States, and while operating inside the United States. I have executed search warrants on cellular phones used by narcotics traffickers in furtherance of their trafficking activities. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics traffickers, and the structure of their narcotics trafficking networks. I also have gained information as to the normal operational habits of persons who make their living as narcotics traffickers.

8. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug smugglers to work in concert with other individuals and to do so by utilizing cellular

telephones, pagers and portable radios to maintain communications with co-conspirators in order to further their criminal activities. I have also witnessed such practices while working in an undercover capacity during the course of several investigations. Conspiracies involved in the smuggling and trafficking of drugs generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators. For example, load drivers smuggling controlled substances across the border are typically in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. I also know that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

10. Based upon my training and experience and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug smugglers and traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, voice messages and social media apps such as Facebook or WhatsApp.

    b. Drug smugglers and traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers, drug traffickers, and their accomplices will use cellular/mobile

telephones because they easily may arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d.    Drug smugglers and traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e.    Drug smugglers and traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f.    Drug smugglers, drug traffickers, and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g.    "SIM" (subscriber identify module or subscriber identification module) or memory cards store identification and contact information of subscribers. They may be transferrable between different cellular/mobile telephones. Drug smugglers, drug traffickers, and their co-conspirators will replace the SIM (memory) cards in their cellular or mobile phones as a means to avoid detection.

11. Based upon my training and experience, consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones and SIM cards can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones.

## FACTS SUPPORTING PROBABLE CAUSE

12. According to a report prepared by Customs and Border Protection ("CBP") Officer Alex Grijava, on February 9, 2018 at approximately 11:51 p.m., CBP Officer A.

1  Grijava was conducting roving operations in the pre-primary area at the San Ysidro,
2  California port of entry. His narcotic detector dog "Miki" alerted to the rear passenger-
3  side door of a white Honda Civic bearing California license plate 7XXZ686.

4      13.    Officer Grijava approached the driver of the car, later identified as REYES.
5  He signaled for her to lower the driver-side window. She complied. He told her that he
6  would be conducting a brief inspection of the car. Based on Officer Grijava's instructions,
7  REYES turned off the car and handed him the keys. Officer Grijava asked her if the car
8  belonged to her. She said, "yes." He asked how long she owned the car. She said, "since
9  August of last year." He asked her what she was doing in Mexico. She said that she went
10 to visit a friend.

11     14.    Officer Grijava noticed that REYES began to avoid eye contact during her
12 responses. He also noticed her hands began to shake. Officer Grijava then asked REYES
13 if she did anything special with her friend. She said that they went to the movies. Officer
14 Grijava asked her for the title of the movie. She hesitated and then gave a Spanish movie
15 title. He asked if the movie was any good. She said, "no, not really." Officer Grijava then
16 asked REYES what time she arrived in Mexico. She hesitated, shrugged her shoulders and
17 then said, "7:30." He then asked her what time the movie started. She hesitated and then
18 said, "8:30." Officer Grijava then thanked defendant for her answering his questions. He
19 then received two negative customs declarations from her.

20     15.    Officer Grijava then used a screwdriver and flashlight to inspect the rear
21 passenger side door. He saw white cotton-like padding within the door frame. Officer
22 Grijava then asked REYES to turn on the car and to lower all of the windows. REYES
23 complied. Officer Grijava saw that the rear windows did not lower all the way. He asked
24 REYES if the rear windows only lower partially. She said she did not know. Officer
25 Grijava asked REYES to try and lower the windows a few more times. They only remained
26 partially lowered. Officer Grijava then had the vehicle referred for secondary inspection.

16. According to a report prepared by CBP Officer Jo Nguyen, REYES drove the car through the Z-portal machine. Based on the images taken of the car, Officer Nguyen noticed anomalies in the passenger-side rear door of the car.

17, According to a report prepared by CBP Officer J. Sanchez, Officer Sanchez examined the images and began an inspection of the car. Officer Sanchez removed two brick-shaped packages concealed in the passenger-side rear door. Officer Sanchez determined that the packages contained a white powdery substance. He tested the substance, which tested positive for cocaine. He weighed the packages, receiving a total weight of 2.3 kilograms.

18. Officer Sanchez also seized one cell phone – the **Target Phone** – from the car.

19. At approximately 5:31 a.m., I along with Special Agent Nathaniel Fountain made contact with REYES in an interview. REYES was advised on her constitutional rights per *Miranda* in the English language. REYES said that she understood her rights and agreed to waive those rights. REYES denied knowledge of the drugs in her car. REYES said that she attended the 8:30 p.m. showing of "La Boda de Valentina" in Plaza Galerias with her friend Nicole Santana and her mother. The movie lasted approximately two hours. She then took her friend and her mother back to their house. It was an approximately 15-20 minute drive to their house. She stayed there for approximately an hour. She then drove to the border. The drive was approximately 7-8 minutes.

20. When REYES was asked what she believed was in the car, REYES said, "I believe. . . I imagine drugs." Her hands began to shake, her lips quivered and her eyes became watery. She said she did not know how drugs would get into her car.

21. REYES maintained that she was the owner of the car. She said that she was the only person with access to the car. She claimed a similar situation happened to her friend, Michelle Flores. She said that friend went to prison for six months.

22. REYES also said that her boyfriend Cristian Fuentes is a truck driver. She said that he went to Tijuana around 11 p.m. but that she was unable to see him.

23. REYES was placed under arrest and charged by complaint (18MJ0638) with importation of cocaine, in violation of 21 U.S.C. §§ 952, and 960. On March 8, 2018, REYES waived indictment was charged with importation of cocaine by way of a single-count Information in 18CR1269-BAS.

24. According to crossing records accessed from the Treasury Enforcement Communications System ("TECS"), REYES first crossed in the car on or about August 30, 2017. Between October 7, 2017 and February 13, 2018, the car crossed approximately 36 times through the San Ysidro, California Port of Entry, and approximately 2 times through the Otay Mesa, California Port of Entry. During that same time, REYES crossed approximately 48 times.

25. Based on my training, experience, the location of the drugs, and the manner of concealment, I believe the packages consisted of drugs intended for importation and distribution. Based upon my experience and investigation in this case, I believe that REYES, as well as other persons yet unknown, were involved in an on-going conspiracy to import and distribute cocaine into various parts of the United States. Based on my experience investigating narcotics smugglers, I also believe that REYES may have used **Target Phone** to coordinate with co-conspirators regarding the importation and distribution of the cocaine, and to further this conspiracy both inside and outside of the United States. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of cellular phones and sim cards, which may identify other persons involved in drug trafficking activities.

26. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of REYES and her co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the cellular

telephones described herein. Moreover, this warrant seeks data from **Target Phone** for the period of October 7, 2017 (the first time in 2017 when REYES crossed in the load vehicle) through February 9, 2018 (the date of REYES's arrest.)

## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect **Target Phone** and subject it to analysis. All forensic analysis of the data contained within the telephones and the memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

8

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

30. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude REYES used the **Target Phone** to facilitate the offense of importing cocaine. **Target Phone** was likely to be used to facilitate the offense by transmitting and storing data, specifically that described in Attachment B, which constitutes evidence of violations of 21 U.S.C. §§841, 846, 952, 960 and 963. I also believe that probable cause exists to believe that evidence, fruits and instrumentalities of illegal activity committed by REYES continues to exist on **Target Phone** as described in Attachment A because the phone has been stored in a secure location. Therefore, I respectfully request that the Court issue these warrants.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Rainier Mendoza
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this ___17___ day of July, 2018.

The Honorable Nita L. Stormes
United States Magistrate Judge

9

# ATTACHMENT A
## PROPERTY TO BE SEARCHED

### Target Phone

One (1) Apple iPhone A1661
FCC# BCG-E3087A
IC# 579C-E087A

Currently in the possession of Office of the Special Agent in Charge (SAC), Homeland Security Investigations (HSI), at 880 Front Street, San Diego, California 92101.

## **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search **Target Phone** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Phone** for evidence described below. The seizure and search of **Target Phone**, and will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from **Target Phone** and will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data for the period of October 7, 2017 to February 13, 2018,

a. tending to identify attempts to import cocaine or some other controlled substance from Mexico into the United States, or distribute cocaine or some other controlled substance within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of cocaine or some other controlled substance from Mexico into the United States, or possession with the intent to distribute cocaine or some other controlled substance within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of cocaine or some other controlled substance from Mexico into the United States, or possession with the intent to distribute cocaine or some other controlled substance within the United States;

d. tending to identify travel to or presence at locations involved in the importation of cocaine or some other controlled substance from Mexico into the United States, or possession with the intent to distribute cocaine or some other controlled substance within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963.